UNITED STATES of America,
Plaintiff,

v.

43.47 ACRES OF LAND, More or Less, Situated in the County of Litchfield, Town of Kent, et al., Defendants.

Schagticoke Tribal Nation, Plaintiff,

v.

Kent School Corporation, Inc., et al., Defendants.

Civil Nos. H–85–1078 (PCD), Civ. 3:98cv1113 (PCD).

United States District Court, D. Connecticut.

March 31, 1999.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, for USA.

Eric Watt Wiechmann, Karen L. Wagshul, Cummings & Lockwood, Hartford, CT, Thomas W. Van Lenten, Pinney, Payne, Van Lenten, Burrell, Wolfe & Dillman, Danbury, CT, for Schagticoke Tribe of Indians.

James R. Fogarty, Leland C. Selby, Epstein, Fogarty, Cohen & Selby, Greenwich, CT, for Preston Mountain Club, Inc.

William H. Bright, Jr., Eric Watt Wiechmann, Cummings & Lockwood, Hartford, CT, Thomas W. Van Lenten, Pinney, Payne, Van Lenten, Burrell, Wolfe & Dillman, Danbury, CT, for Schaghticoke Tribal Nation.

David J. Elliott, Allan B. Taylor, Stephen Benjamin Reynolds, Day, Berry & Howard, Hartford, CT, for Kent School Corporation, Inc., Appalachian Trail Conference Inc., Barbara G. Bush.

James K. Robertson, Jr., Giovanna M. Tiberii, Richard L. Street, Walter F. Torrance, Jr., Carmody & Torrance, Waterbury, CT, for Connecticut Light & Power Co.

Jeffrey B. Sienkiewicz, Sienkiewicz, McKenna & Sienkiewicz, New Milford, CT, for Town of Kent.

Carolyn Kyle Querijero, Attorney General's Office, Special Litigation, Hartford, CT, for State of Connecticut, amicus.

## RULING ON PENDING MOTIONS

DORSEY, Senior District Judge.

Currently pending are Schagticoke Tribal Nation's (the "Tribe") motions to consolidate and for separate trial to determine tribal status. The Tribe filed identical motions in the above captioned cases, *United States v. 43.47 Acres of Land, et al.* (the "condemnation action"), and *Schagticoke Tribal Nation v. Kent School Corporation, et al.* (the "land claim action" or "Schagticoke II"). As discussed below, the motions are denied without prejudice. Also pending is the Tribe's request for leave to file third supplemental memorandum in support of motion for separate trial to determine tribal status. This request is granted and consideration is given to the Tribe's third supplemental memorandum.[1]

## I. BACKGROUND

These motions represent the latest installments in a long saga. Both of these cases involve claims of the Tribe[2] under the Nonintercourse Act, 25 U.S.C. § 177. The condemnation action involves the fed-

---

1. Also pending is the Tribe's request for leave to file fourth supplemental memorandum of law in support of motion for separate trial to determine tribal status. This request was filed after consideration of the motion had been undertaken and presents additional factual allegations to which non-movants have not had opportunity to respond. Accordingly, the request is denied as untimely by separate order.

2. Although movant is referred to as the "Tribe", it is not a tribe for federal purposes until recognized as such under federal law.

eral government's attempt to acquire title to 43.47 acres of land under its eminent domain power for the Appalachian Trail. The Preston Mountain Club (the "Club") is a defendant on the basis of its ownership interest in this land. The Tribe filed a claim to this land under the Nonintercourse Act. The land claim action involves the Tribe's attempt to acquire title to other lands in Kent, Connecticut, under the Nonintercourse Act. Defendants in the land claim action include the Club as well as other present occupants of the land (collectively, the "land claim defendants"). The Tribe's standing and likelihood of success in both actions depend on its status as a formally recognized Indian tribe.

Regulation of Indian matters has been delegated to the Bureau of Indian Affairs ("BIA"), within the Department of the Interior. BIA has established a procedure by which Indian tribes may seek formal recognition. *See* 25 C.F.R. §§ 83.1–83.13 (1998) (a group of Indians must show among other things that (a) they have been identified since 1900 as "American Indian" on a roughly continuous basis; (b) a predominant portion of their group comprises a distinct community which has existed since time immemorial; and (c) they have maintained tribal political influence over its members as an entity); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d. Cir.1994). Such recognition is necessary in order to take advantage of certain federal privileges and programs available to Indian tribes. *Golden Hill*, 39 F.3d at 57. A tribe must petition BIA's Branch of Acknowledgement and Research ("BAR") for acknowledgement. BAR maintains a staff of historians, anthropologists and genealogists to evaluate these petitions. The Tribe's petition with BAR remains pending.

The Tribe's legal and administrative proceedings have an extensive history. The Tribe brought its first suit in 1975, *Schagticoke Tribal Nation v. Kent School Corporation, et al.,* H–75–125 ("Schagticoke I"). In 1981, the Tribe filed a letter of intent to petition BAR for acknowledgement. In 1985, the government filed the condemnation action. On June 23 and August 3, 1993, Schagticoke I was dismissed without prejudice for failure to prosecute. On December 7, 1994, the Tribe filed its Petition for Acknowledgement with BAR, 1,200 pages long. On June 5, 1995, BAR replied with a Technical Assistance Letter, a routine response in which BAR indicated, as an initial impression, those areas of the petition which required supplemental documentation. On April 16, 1997, the Tribe submitted Anthropological and Historical Reports of over 8,000 pages and a computer disc with genealogy information. On April 23, 1997, the Tribe requested that its petition be placed on the "Ready, Waiting for Active Consideration" list (the "list"). On June 2, 1997, the petition was placed on the list. As of July 18, 1997, the petition was 11th on the list. On February 13, 1998, the Tribe requested active consideration of its petition out of order. On April 2, 1998, the Tribe submitted an additional 1,000 pages of material. On May 22, 1998, the Assistant Secretary of the Interior– Indian Affairs denied the request for active consideration. On June 12, 1998, the Tribe filed its complaint in the land claim action. As of June 17, 1998, the Tribe's petition was ninth on the list. All but two of the petitioners ahead of the Tribe filed after the Tribe but they responded to BAR's Technical Assistance Letter more quickly.

## II. *DISCUSSION*

### A. *The Motion for Separate Trial*

Fed.R.Civ.P. 42(b) provides that "[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim". "Bifurcation, however, is a procedural device to be employed only in exceptional circumstances." *Marisol A. v. Giuliani,* 929 F.Supp. 662, 693 (S.D.N.Y.1996). Bifurcation is only appropriate where (1) separate trials would promote judicial

economy and convenience; or (2) a single trial would prejudice the interests of a party. *Katsaros v. Cody,* 744 F.2d 270, 278 (2d Cir.1984).

The parties acquiesce that it is in the court's discretion to order a separate trial on the issue of tribal status. *See In re Master Key Antitrust Litigation,* 528 F.2d 5, 14 (2d Cir.1975). The land claim defendants and government argue that a separate trial would serve neither efficiency, economy nor convenience. They argue that they cannot prepare for a separate trial according to the Tribe's timetable. The Tribe took 16 years from its letter of intent to petition BAR to its request to be placed on the list, and spent at least four years gathering documents. The government and land claim defendants also object to the significant expense which this document intensive trial would entail. The Tribe contends that the issue of Tribal status readily lends itself to a separate trial. The Tribe suggests that its opponents can pool resources, take advantage of the Tribe's collected and organized documents, and deal with a dispositive issue first. It argues in favor of fast-tracking a trial on status so that its claims to this land can be resolved. A separate trial on the issue of tribal status is premature, because the doctrine of primary jurisdiction indicates that resolution of this issue should be deferred to BAR. *See Golden Hill,* 39 F.3d at 60.

### B. *Primary Jurisdiction*

Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body...." *United States v. Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Primary jurisdiction is distinct from, although often confused for, the doctrine of exhaustion in that exhaustion applies where an agency has exclusive jurisdiction over a legal question in the first instance. *See id.,* at 63, 77 S.Ct. 161. Primary jurisdiction, on the other hand, "recognizes that even though Congress had not empowered an agency to pass on the *legal* issues presented by a case raising issues of federal law, the agency's expertise may, nevertheless, prove helpful to the court in resolving difficult *factual* issues." *Johnson v. Nyack Hospital,* 964 F.2d 116, 122 (2d Cir.1992) (emphasis in original); *see also Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 304, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). With respect to such technical, complicated issues of fact, primary jurisdiction "more than prescribes the mere procedural timetable of the lawsuit. It is a doctrine allocating the lawmaking power." *Western Pac. R.R.,* 352 U.S. at 63, 77 S.Ct. 161. In resolving such issues of fact, the doctrine thus promotes the proper relationship between the courts and administrative agencies. *Id.*

There is no formula for the application of primary jurisdiction. *General Elec. Co. v. MV Nedlloyd,* 817 F.2d 1022, 1026 (2d Cir.1987) ("Analysis is on a case-by-case basis."). As the doctrine's usefulness decreases in proportion as legal issues predominate over factual, a fact intensive approach is historically employed. It must be determined "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Western Pac. R.R.,* 352 U.S. at 64, 77 S.Ct. 161. This analysis encompasses the need for uniform agency action, the degree to which expert or specialized knowledge is required, the nature of the dispute, whether the agency's determination will prove helpful, historical application of the doctrine, the agency's authority, whether the dispute lies at the heart of the agency's assignment from Congress, and the potential delay in resolving the under-

lying dispute.[3] No factor alone is determinative. *See e.g., Mashpee Tribe,* 592 F.2d at 581.

### 1. *Uniformity of Agency Action*

Early appearances of the primary jurisdiction doctrine emphasized the need for uniformity, which would occur if the same agency initially answered certain types of specialized questions. *See Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), *Western Pac. R.R.,* 352 U.S. at 64, 77 S.Ct. 161. This factor remains an important consideration. *General Elec.,* 817 F.2d at 1027; *Goya Foods,* 846 F.2d at 851. Congress erected the procedures for federal acknowledgement to achieve a uniform approach to eligibility for federal privileges and rights such as the Nonintercourse Act. *See* 25 C.F.R. § 83.2 (1998). Judicial treatment poses a two-fold risk to Congress's scheme. First, judicial treatment could develop varying standards for recognition of Indian tribes such that acknowledgement could differ across state boundaries and with regard to the purpose for which acknowledgement is sought. Admittedly, BAR employs a standard slightly different from that of the Nonintercourse Act. *Golden Hill,* 39 F.3d at 59 ("The two standards overlap, though their application might not always yield identical results."). Nevertheless, both inquiries consider the same criteria to answer the same question. Thus, a uniform examination minimizes the risk of inconsistency. "[I]t is desirable that the agency and the court go down the same track—although at different times— to attain the statute's ends by their coordinated action." *Id.*

Second, judicial action now would disrupt BAR's procedural framework and interfere with all of BAR's petitions. In response to the Tribe's request for immediate consideration, Kevin Gover, Assistant Secretary– Indian Affairs, replied that a waiver of the priority provisions would not be in the best interests of Indians, in light of the number of applications. *See* Ex. C, Tribe's Memo. of law in sup. of mot. for separate trial to determine tribal status. As of September 30, 1998, 15 petitions were under active consideration, 12 were on the list, and over a hundred more were in lesser stages of completion. *See* Ex 1, Third supplemental memo. in sup. of mot. for separate trial to determine tribal status. A shortcut to this procedure would erode BAR's ability to monitor and administer the progress of these petitions. The petitioners also would have little certainty about the BAR process and be encouraged to flood the courts. *See Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 653, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973) (deference to dam potential flood of suits which could be avoided by uniform agency consideration). The Congressional scheme offers multiple opportunities for public comment, not readily available in a lawsuit. 25 C.F.R. §§ 83.10(I), 83.11(c)(2) 83.11(f)(4).

In contrast, the Tribe does not justify a departure from the BAR procedure beyond the desire for adjudication of its claims. Every litigant enjoys the right to prompt resolution of its dispute, *Golden Hill,* 39 F.3d at 60; in this case, Congress's scheme defines promptness. Congress directed the Department to take "a uniform approach in their evaluation" of federal acknowledgement and established regulations for this purpose. 43 Fed.Reg. 39, 361. Thus, Congress intended that aspiring tribes use the BAR system. Any fault in this respect is endemic to Congress's program. The Tribe's conduct also

---

**3.** *See, e.g., id.,* at 64–65, 77 S.Ct. 161; *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 302, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); *Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 115, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Nader,* 426 U.S. at 304, 96 S.Ct. 1978; *Goya Foods, Inc. v. Tropicana Products, Inc.,* 846 F.2d 848, 851 (2d Cir.1988); *General Elec.,* 817 F.2d at 1026; *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir. 1979); *Golden Hill,* 39 F.3d at 59–61; *Johnson,* 964 F.2d at 122; *Skubel v. Sullivan,* 925 F.Supp. 930, 936 (D.Conn.1996).

was a factor in the process. It first sought BAR's expertise and controlled completion of its petition. The Tribe cannot disclaim the program it invoked. It must offer some justification outside of these regulations to escape their control.

### 2. *Expert or Specialized Knowledge*

The degree of involvement of specialized or technical factual questions is a primary factor. *Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. 161; *General Elec.*, 817 F.2d at 1027. Indian tribe acknowledgement raises significant, highly specialized historical and anthropological issues. *See Golden Hill*, 39 F.3d at 60. BAR's staff of genealogists, anthropologists, and historians, are all trained and experienced in Indian acknowledgement issues. *James v. U.S. Department of Health and Human Services*, 824 F.2d 1132, 1138 (D.C.Cir.1987). No similar expertise is available in the court. Appropriately, "the agency's expertise should first be brought to bear on the matter." *General Elec.*, 817 F.2d at 1027.

### 3. *The Nature of the Dispute*

■ Primary jurisdiction does not apply "when the issue at stake is legal in nature and lies within the realm of judicial competence." *Goya Foods*, 846 F.2d at 851; *see also, Nader*, 426 U.S. at 304, 96 S.Ct. 1978. This factor compares the nature of the administrative proceeding with the legal action. *Goya Foods*, 846 F.2d at 852. The Tribe presents the legal issue of its standing under the Nonintercourse Act in both the condemnation and land claim actions. This is a legal issue which the court must decide. *See Golden Hill*, 39 F.3d at 59. Nevertheless, the factual dispute at the core of this issue lies within BAR's realm. *Id.* The ultimate legal question heavily relies on the factual determination which does not fall "within the conventional competence of the courts". *Nader*, 426 U.S. at 305, 96 S.Ct. 1978; *compare Golden Hill*, 39 F.3d at 60 (deference on question of federal acknowledgement for Indian tribal status), *with Goya*

*Foods*, 846 F.2d at 854 (no deference where ultimate legal question is trademark infringement). Moreover, jurisdiction over the legal resolution is retained, as the mandatory course in cases of primary jurisdiction is to stay the case pending the agency's determination. *Golden Hill*, 39 F.3d at 61.

### 4. *Helpfulness of Agency Determination*

Deference to agency determination does not serve the purposes of primary jurisdiction if it "promises to be of material aid in resolving the [legal] question." *Ricci*, 409 U.S. at 302, 93 S.Ct. 573. The agency determination need not affirmatively resolve the factual issue before the court. *Mashpee Tribe*, 592 F.2d at 581. BAR's decision would materially and in two ways. One, the decision itself would be due great deference. *Masayesva v. Zah*, 792 F.Supp. 1178, 1184–1186 (D.Ariz.1992). Two, the agency's record of proceedings should prove immensely helpful, bolstered by the impartial analysis of BAR's staff. Thus, the potential helpfulness of a determination by BAR weighs heavily in favor of invoking primary jurisdiction.

### 5. *Agency Factors*

A number of factors relate to the nature of the agency and its role as envisioned by Congress: historical application of the doctrine, *Goya Foods*, 846 F.2d at 852; the agency's authority, *Golden Hill*, 39 F.3d at 60; and "whether the agency determination lays at the heart of the task assigned the agency by Congress, *Mashpee Tribe*, 592 F.2d at 580. Historically, before Congress promulgated these regulations, Indian tribes previously achieved federal acknowledgement by other methods. Since the regulations, BAR has been the primary means for acknowledgement." *Compare Mashpee Tribe*, 592 F.2d at 581 (no deference to BIA when regulations were not fully implemented), *with James*, 824 F.2d at 1138 (after regulations were in effect, "the time for a different conclusion [than the ruling in *Mashpee Tribe*] has

come"). BIA and BAR must have statutory authority to resolve the factual dispute. *Ricci,* 409 U.S. at 304, 93 S.Ct. 573. Unquestionably BAR has the authority to deal with this question; it has answered and is currently working on numerous petitions comparable to the Tribe's. The Tribe challenges BIA's impartiality in that the condemnation action was brought on behalf of the National Parks Service, another agency within the Department of the Interior. However, the Tribe must raise this issue with BIA first, as it is not necessary to decide BAR's final jurisdiction here. *See id.* The last consideration asks whether, assuming the agency has statutory authority, it is appropriate for the agency to undertake factual inquiry of this kind. Congress created BAR and promulgated these resolutions for just this purpose and thus it is "at the heart of the task assigned by Congress ...". *Golden Hill,* 39 F.3d at 60.

### 6. *Potential Delay*

Finally, the potential delay which will result from awaiting BAR's determination must be considered. *Golden Hill,* 39 F.3d at 60. BAR does not process petitions quickly ruling on the Tribe's petition will take three years, and likely more. *See* Affidavit of Attorney Jerry Strauss, Ex. A to Tribe's memo. in sup. of separate trial to determine tribal status. Like all litigants, the Tribe has an interest in prompt resolution of its claims. *Golden Hill,* 39 F.3d at 60. It cannot escape all responsibility for this timing, in that it took 16 years to complete its application. Additionally, a trial cannot proceed with the speed which the Tribe requests. The government and land claim defendants need considerable time to conduct discovery. Finally, the Tribe itself applied to BAR and therefore committed itself to BAR's timetable. *Golden Hill,* 39 F.3d at 60 ("deferral is fully warranted here where the plaintiff has already invoked the BIA's authority").

▮▮▮ Although the potential for delay weighs in the Tribe's favor, the balance of all the factors clearly indicates that defer-

ence to BAR is warranted. Furthermore, even great delay will not prevent agency consideration where all other factors lean heavily in favor of deference. "The doctrine of primary jurisdiction thus does not more than prescribe the mere procedural time table of the lawsuit. It is a doctrine allocating the law-making power over certain [factual issues]. It transfers from court to agency the power to determine [such issues]." *Western Pac. R.R.,* 352 U.S. at 65, 77 S.Ct. 161. In such circumstances, the lawsuit is stayed while the agency proceeds with its inquiry. *Deaktor,* 414 U.S. at 115, 94 S.Ct. 466; *Golden Hill,* 39 F.3d at 60–61.

### C. *Motion to Consolidate*

▮▮▮ The Tribe moves to consolidate these actions. Fed.R.Civ.P. 42(a) provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." There is broad discretion to determine whether the actions call for consolidation. *Malcolm v. National Gypsum Co.,* 995 F.2d 346, 350 (2d Cir.1993).

The only question common to the condemnation and land claim actions is the issue of the Tribe's status as an Indian tribe. This issue awaits resolution by BAR, not the undersigned. Both actions are stayed pending this resolution. Other factors also oppose consolidation: the actions arise under different legal theories, with different plaintiffs, different defendants, and different legal claims. As these actions will not go to trial on the issue of tribal status, there is no reason to consolidate them at this time.

### III. *CONCLUSION*

For the foregoing reasons, the Tribe's motion for separate trial to determine tribal status [Docs. # 101, Civ. No. H–85–1078, and # 15, Civ. No. 3:98cv1113] is DENIED without prejudice to renewal at the conclu-

sion of BAR's proceedings. The Tribe's motion to consolidate [Docs. # 110, Civ. No. H–85–1078, and # 13, Civ. No. 3:98cv1113] is DENIED without prejudice to renewal at the conclusion of BAR's proceedings. The Tribe's request for leave to file third supplemental memorandum in support of motion for separate trial to determine tribal status [Docs. # 125, Civ. No. H–85–1078, and # 38, Civ. No. 3:98cv1113] is GRANTED. The clerk is directed to docket the accompanying memorandum.

Both actions are STAYED pending further court order. The parties are ORDERED to file a report informing the court of the status of the BAR proceedings on or before April 1, 2000, or upon the happening of any developments, whichever occurs first.

SO ORDERED.