In re NEW YORK ASBESTOS LITIGATION.

John Consorti, Alfred Luchnick, Peter Pulizzi, Walter Strafford, Vincent Tabolt and Richard Smolowitz, Plaintiffs.

Nos. 92 Civ. 6377 (RWS), 92 Civ. 7283 (RWS), 92 Civ. 2402 (RWS), 92 Civ. 3900 (RWS), 92 Civ. 0763 (RWS) and 88 Civ. 6403 (RWS).

United States District Court, S.D. New York.

June 10, 1993.

Levy Phillips & Konigsberg, New York City, for plaintiffs (Robert I. Komitor and Moishe Maimon, of counsel).

McCarter & English, Newark, NJ by Richard P. O'Leary, for defendant Keene Corp.

Heidell, Pittoni, Murphy & Bach, P.C., New York City, for defendant the Anchor Packing Co. and Garlock Inc. (Lundell Wilson, of counsel).

Barry, McTiernan & Moore, New York City, for defendant John Crane, Inc. (Suzanne M. Halbardier, of counsel).

Flemming, Zulack & Williamson, New York City, for defendant the Flintkote Co. (Cynthia B. Rubin, of counsel).

Hinckley & Silbert, P.C., New York City, for defendant Owens–Corning Fiberglas Corp. (Craig F. Wilson, of counsel).

Gladstein & Isaac, New York City, for defendant Veteran's Pipe Covering (Peter L. Herb, of counsel).

Lester Schwab Katz & Dwyer, New York City, for defendant Fibreboard Corp. (Cynthia Weiss Antonucci, of counsel).

## OPINION

SWEET, District Judge.

Defendant corporations in six consolidated tort actions based on asbestos exposure have moved for separate trials pursuant to Rule 42(b), F.R.Civ.P. before this Court for an order reconsidering the prior consolidation of these cases pursuant to Rule 42(a), F.R.Civ.P., in light of the opinion by the Court of Appeals in the Second Circuit in *Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir. 1993) ("Malcolm") (also referred to as *Kranz v. National Gypsum Co.*). Defendant Keene Corporation ("Keene") has moved for a stay of all asbestos-related litigation pending against Keene in this Court pending the determination of a limited fund settlement class in a separate action before the Honorable Jack B. Weinstein. One third-party defendant, Veteran Pipe Covering Co. Inc. ("Veteran") has moved pursuant also to Rule 14(a), F.R.Civ.P. as well for an order granting Veteran a separate trial.

For the reasons given below, all motions are denied.

### *Parties*

The six cases remaining before this court are: *Consorti*, 92 Civ. 6377; *Luchnick*, 92 Civ. 7283; *Pulizzi*, 92 Civ. 2402; *Strafford*, 92 Civ. 3900; *Tabolt*, 92 Civ. 0763; and *Smolowitz*, 88 Civ. 6403. Of the eighty-eight original defendants, only twelve remain. Five of the direct defendants have not submitted papers in support of this motion.

Plaintiff John Consorti ("Consorti") alleges that he suffers from mesothelioma due to his exposure to certain of the defendants' products. Consorti, a smoker and 40% owner of Veteran, a family insulator business, claims exposure to approximately twenty-five asbestos-containing products, including pipe-covering, felt, roofing paper, mastics, cloth, sewing twine, adhesive, and asbestos-containing cement. Consorti originally sued the largest number of defendants, and the largest number of defendants are still left in his case. The defendants who have submitted papers are the Anchor Packing Company ("Anchor"), alleged to have produced asbestos-containing gaskets and packing; the Flintkote Company ("Flintkote"), alleged to have produced asbestos-containing tile and black Orangeburg pipe; Fibreboard Corporation ("Fibreboard"), the Keene Corporation ("Keene"), and Owens–Corning Fiberglas Company ("OCF"), all alleged to have produced asbestos-containing insulation. OCF has interpleaded two additional third-party defendants, one of which is Veteran, Consorti's immediate employer.

Plaintiff Richard Smolowitz ("Smolowitz"), a smoker, alleges injury from asbestosis, resulting from exposure to taping materials, pipe insulation, and asbestos-containing cement in the course of his work as a taper from 1954 to 1980. Smolowitz has alleged that he worked at Seaview Village in 1966, at the Chatham Towers in lower Manhattan, at the Mitchell Lama projects in Rockaway in the late 60's and 70's, at the Roosevelt Raceway and the Brooklyn Navy Yard in Brooklyn from 1970–72, and at the Woolworth

Building, 55 Water Street, Sloan Kettering Hospital, the New York Coliseum, Lincoln Center, the Exxon Building, 666 Fifth Avenue, 90 Park, the Empire State Building and at the Port Authority's World Trade Center from 1971 to 1973. He also alleges that he was exposed to these asbestos-laden materials during his work at private residences from 1973 to 1979 and at Brooklyn College from 1979–1980. Although asbestosis is not fatal, Smolowitz has alleged an increased fear of cancer requiring psychological care due to his exposure to the Defendant's products. The defendants who have submitted papers in *Smolowitz* are OCF and Flintkote.

The remaining four plaintiffs are deceased. The estate of plaintiff Peter Pulizzi ("Pulizzi"), a smoker alleged to have died from mesothelioma, claims he was exposed due to his employment as a shipfitter to pipecovering at the Brooklyn Navy Yard from 1942 to 1945. The defendants who have submitted papers in *Pulizzi* are Fibreboard, Anchor, Keene, and Garlock, Inc. ("Garlock").

The estate of plaintiff Alfred Luchnick ("Luchnick"), a nonsmoker alleged to have died from mesothelioma, claims he was exposed during his work as a welder at the Brooklyn Navy Yard, from 1940 to 1945. The defendants who have submitted papers in *Luchnick* are Fibreboard, Garlock, and Keene.

The estate of Walter Strafford ("Strafford"), a smoker alleged to have died from mesothelioma or lung cancer,[1] claims he was exposed to asbestos in 1962 from packing materials and gaskets, during work dismantling and refurbishing valves in a sheetmetal shop. The defendants who have submitted papers in *Strafford* are John Crane Inc. ("Crane") alleged to have produced asbestos-

containing gaskets and packing material, and Anchor.

The estate of Vincent Tabolt ("Tabolt"), a pipesmoker alleged to have died of mesothelioma, claims he was exposed between 1965 and 1972 due to loading and unloading bags of asbestos-containing cement and apparently other substances at the Lowville Farmer's Cooperative Incorporated, New York. The sole Defendant who has submitted papers in *Tabolt* is Flintkote.

### Prior Proceedings

Asbestos-related tort actions brought in the Southern and Eastern Districts of New York pursuant to New York's revival statute[2] were subdivided by the worksite at which the plaintiffs were exposed to asbestos. The three categories were cases involving exposure at the government-owned shipbuilding facility the Brooklyn Navy Yard, cases involving exposure during the construction or repair of powerhouses, and cases in which the plaintiffs' principle exposure was either at a shipyard other than the Brooklyn Navy Yard or a construction site not included in the Powerhouse consolidation. By Order dated May 1, 1991, the Honorable Charles L. Brieant, Chief Judge, directed plaintiffs' counsel to identify all personal injury and wrongful death cases filed in the Southern and Eastern Districts of New York which were not part of the Brooklyn Navy Yard or the Powerhouse consolidations for the purpose of transferring these cases for trial before this Court.

In 1977, 1980, 1985, 1986, and 1987 the Multi–District Litigation Panel (the "MDL Panel") considered the consolidation of asbestos litigation, and it declined to transfer the mass of pending asbestos litigation.[3] On November 21, 1990, eight federal district

---

1. Plaintiffs' attorneys originally stated that Strafford suffered from mesothelioma. Plaintiffs' expert now avers that Strafford suffered from either mesothelioma or lung cancer, *see* Notice of Motion for John Crane, Inc.

2. In 1986 New York amended its statute of limitations to start the running of the statute from the discovery of the disease, *see* New York Toxic Tort Reform Act of 1986, L.1986, ch. 682, § 2 (codified at N.Y.C.P.L.R. § 214–c (McKinney 1990)).

3. *Id.* at 417. *See In re Asbestos and Asbestos Insulation Material Products Liability Litigation,* 431 F.Supp. 906 (J.P.M.L.1977); *In re Asbestos Products Liability Litigation (No. II),* MDL–416 (J.P.M.L. March 13, 1980) (unpublished order); *In re Asbestos School Products Liability Litigation,* 606 F.Supp. 713 (J.P.M.L.1985); *In re Ship Asbestos Products Liability Litigation,* MDL–676 (J.P.M.L. Feb. 4, 1986) (unpublished order); and *In re Lon Blair Asbestos Products Liability Litigation,* MDL–702 (J.P.M.L. Feb. 6, 1987) (unpublished order).

judges responsible for the asbestos action in their respective districts urged further consideration. A *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation* (1991) followed, advocating that asbestos litigation be viewed as a national problem requiring a comprehensive solution. In July 1991, the Panel concluded that "centralization in a single district of all pending federal personal injury and wrongful death asbestos actions is necessary," and ordered the pretrial consolidation of 26,639 cases in July 1991. Recognizing that "[t]he heyday of individual adjudication of asbestos mass tort lawsuits has long passed," (quoting *In re Eastern & Southern Districts Asbestos Litigation (In re Johns–Manville Corp.,* 129 B.R. 710 (E. & S.D.N.Y.1991) (Weinstein, J.)), the Panel consolidated the cases, *In re Asbestos Products Liability Litig. (No. VI),* 771 F.Supp. 415, 419 (J.P.M.L.1991).

The Panel thereafter transferred pending asbestos actions to the Eastern District of Pennsylvania for consolidation before the Honorable Charles P. Weiner, and reminded the parties and their counsel of their continuing responsibility to identify and transfer potential "tag-along" actions pursuant to Panel Rule 13(e).

The thirteen actions originally consolidated here were among these cases, and so became part of the universe of all federal asbestos cases when eight of the thirteen were referred to Judge Weiner. The other five are later-filed actions, transferred by order of the Clerk of the Southern District as "tag-along" actions. All were represented to be hardship cases involving malignancies or serious illness and requiring early trial.

All thirteen actions were remanded back to this Court by Judge Weiner by an Order dated December 4, 1992 on the basis of hardship to the plaintiffs arising out of trial delay. Subsequently it was discovered that five of the cases—*Consorti, Luchnick, Klein, Guerriero,* and *Morgan* [4]—had not been transferred to Judge Weiner pursuant to the MDL Order. Judge Weiner vacated that order and retransferred the remaining eight

cases to this Court by amended Order dated December 16, 1992.

The Clerk of the Court in the Southern District of New York notified the MDL Panel by letter that these five cases were potential "tag-along actions" to the cases transferred by the MDL Panel in July of 1991. In January, 1993, judges in the remaining five cases in the Southern District transferred those cases to this court in accordance with then Chief Judge Brieant's order referred to above.

Plaintiffs' motion to consolidate all thirteen hardship asbestos cases before this Court was granted by an Opinion dated February 12, 1993 ("the Opinion"), *In re New York Asbestos Litigation,* 145 F.R.D. 644 (S.D.N.Y.1993). In the Opinion, *Morgan* was severed from the others based Morgan's alleged gastric cancer.

In March, certain of the defendants successfully moved before the MDL Panel for transfer of the tag-along actions from the Southern District of New York to the Eastern District of Pennsylvania. *Consorti* and *Luchnick* were among the cases transferred back to the MDL Panel pursuant to conditional transfer orders in March, 1992; *Consorti* was transferred to Judge Weiner, and *Luchnick* was retained by the MDL Panel until it was remanded to this Court by order of the MDL dated May 24, 1993. *Consorti* is in the process of being remanded to this Court.

On March 5 a trial date of April 14 was set with a pretrial conference to be held on April 7. At the pretrial conference on April 7, a trial date of June 1 was selected in the hope that all discovery would be completed and the transferred cases returned to the Southern District of New York. At a pretrial conference on May 26, the trial date was adjourned to June 21, in order to permit the instant motion and the return of all cases to this district.

Certain defendants in these six actions have now moved for the Court to reconsider the consolidation of these cases in light of

---

4. The facts and prior proceedings of these cases, which have since been settled, were set out in this Court's prior Opinion; *see In re New York*

*Asbestos Litigation,* 145 F.R.D. 644 (S.D.N.Y. 1993).

*Malcolm v. National Gypsum Co.,* 995 F.2d 346 (2d Cir.1993). Oral argument was heard June 4, 1993, and the motion was considered fully submitted as of that time.

### Discussion

### Consolidation, Toxic Torts, and Asbestos

■ Mass toxic tort cases, including asbestos cases, may be consolidated by a Court if they meet the requirements of Rule 42(a), F.R.Civ.P.:

> When actions involving a common question of law or facts are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

The consolidations of mass toxic tort cases has created its own body of law, but such consolidations are still governed by the concerns of Rule 42(a):

> Consolidations of tort actions sharing common questions of law and fact is commonplace. This is true of asbestos-related personal injury cases as well.
>
> The trial court has broad discretion to determine whether consolidation is appropriate. In the exercise of discretion, courts have taken the view the considerations of judicial economy favor consolidation. However, the discretion to consolidate is not unfettered. Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial.

*Johnson v. Celotex Corp.,* 899 F.2d 1281, 1284–85 (2d Cir.) (citations omitted) *cert. denied,* 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990). However, as the Court of Appeals observed in *Malcolm,* "the benefits of efficiency can never be purchased at the cost of fairness," *Malcolm,* 995 F.2d at 350. The Court of Appeals had observed earlier:

> [W]e are mindful of the dangers of a streamlined trial process in which testimony must be curtailed and jurors must assimilate vast amounts of information. The systemic urge to aggregate litigation must not be allowed to trump our dedication to

individual justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation.

*In re Brooklyn Navy Yard Asbestos Lit. In re Joint Eastern & Southern Asbestos Litig.,* 971 F.2d 831, 853 (2d Cir.1992) (*Brooklyn Navy Yard II* ).

The facts in *Malcolm* are significantly different from the underlying facts in the case at bar. In that trial, the Honorable Charles P. Sifton consolidated over 600 cases upon the central thread that each plaintiff has been exposed to asbestos in one or more of over 40 power-generating stations, or "powerhouses", in New York state, *see In re Joint Eastern & Southern Districts Asbestos Lit.,* 798 F.Supp. 925 & 798 F.Supp. 940 (E. & S.D.N.Y.1992). The trial procedure in *Malcolm* resulted as follows:

> Forty-eight were selected from the 600 cases for trial on a reverse-bifurcated basis, i.e. damages to be tried first and then liability.... Each of the 48 plaintiffs had named as defendants between 14 and 42 manufactures or distributors of asbestos-containing products. Of these, 25 appeared at trial as direct defendants ... During the four-month damages trial, evidence of the debilitating diseases and/or deaths of all 48 plaintiffs was presented to the jury.... [D]etailed testimony for each victim was necessary....

*Malcolm,* at 348–49. In addition there were a number of impleaded third-party defendants:

> Several of the defendants impleaded third-party defendants. For example, on March 18, 1991, 13 days before the trial began, Judge Sifton allowed defendant Owens–Corning Fiberglas Corporation to impled over 200 companies. Some of the third-party defendants, in turn, impleaded fourth-party defendants.

*Id.* at 348. Here, there are but six plaintiffs, twelve defendants, and two third-party defendants, only one of which (Veteran) has filed papers to date in opposition to a consolidated trial.

In *Malcolm,* the Court of Appeals found that Keene's "state-of-the-art" defense strat-

egy had suffered prejudice in the consolidated trial:

> Keene readily conceded that it was known early on that massive, prolonged, and *direct* exposure to pure asbestos dust was dangerous; but Keene vehemently disputed that *bystander* exposure, such as that suffered by Mr. Lewis, was known to be dangerous when Lewis was allegedly exposed to Keene's products.
>
> We are concerned that the jury's ability to focus on this distinction may have been compromised in this case. While the evidence regarding Lewis' exposure to Keene's products was vague, minimal, and heavily circumstantial when compared to the extensive evidence regarding the products of defendant Owens–Corning Fiberglas, the jury apportioned an equal 9% liability to each defendant. This is hard to explain.

*Malcolm,* at 352 (emphasis in original). Although this "state-of-the-art" defense was only one strategy—another was to deny that the defendant had been exposed to any asbestos-containing products of Keene at all (*Malcolm* at 354 (Walker, J., dissenting))—the Court of Appeals found that the welter of information so overwhelmed the jury that, once the jury found Keene liable, its particular defenses were lost in the sheer mass of information: "We conclude that under the unique circumstances of this case, there is an unacceptably strong chance that the equal apportionment of liability amounted to the jury throwing up its hand in the fact of a torrent of evidence." *Id.* at 352.

The Court of Appeals remanded the cases based upon improper consolidation. However, the Court was explicit that its opinion did not change the governing standards for consolidation; its opinion merely states that in *Malcolm,* consolidation was not warranted:

> We do not wish to be understood as condemning all consolidations of asbestos cases. Our holding today is narrow and amounts to little more than a caution that it is possible to go too far in the interests of expediency and to sacrifice basic fairness in the process.

*Malcolm,* at 354.

Instead, the Court of Appeals upheld the eight-factor test devised by a Maryland district court and previously approved by the Second Circuit in *Johnson.* *In re All Asbestos Cases Pending in the United States District Court of the District of Maryland,* (D.Md. Dec. 16, 1983) (*en banc*) (hereinafter *In re Maryland Asbestos Cases*) was one of the first decisions which tackled the difficulties inherent in mass asbestos litigation. The eight factors which the Maryland court stated had to be considered in consolidating asbestos cases are: "(1) common worksite; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether plaintiffs were living or deceased; (6) status of discovery in each case; (7) whether all plaintiffs were represented by the same counsel; and (8) type of cancer alleged ..." *In re Maryland Asbestos Cases* at 3 (the "Maryland Factors"). The Court of Appeals in *Malcolm* applied the same eight-factor test.

In addition, the opinion of the Court of Appeals notes that according to this test earlier consolidations have been successful, and reaffirms the consolidations in *Johnson* and *In re Brooklyn Navy Yard II:*

> To strike the appropriate balance as to consolidation *vel non,* "[c]ourts in the Southern and Eastern districts of New York have used [the Maryland] criteria ... as a guideline in determining whether to consolidate asbestos exposure cases." *Johnson,* 899 F.2d at 1285.... As in *Johnson,* we again conclude that the test furnishes a useful guideline to evaluate consolidation of asbestos cases....

*Malcolm,* at 350–51. The Court in *Malcolm* praised the results in the consolidation by Judge Weinstein of 64 cases alleging exposure in the Brooklyn Navy Yard: "We did applaud Judge Weinstein 'for his innovative managerial skills,' and indeed, the consolidation in *Brooklyn Navy Yard* is a chiaroscuro study in contrast with the instant case," *Malcolm* at 353; *see In re Eastern & Southern District Asbestos Lit. (In re Brooklyn Navy Yard I),* 772 F.Supp. 1380 (E. & S.D.N.Y. 1991), *aff'd in part and reversed in part, Brooklyn Navy Yard II,* 971 F.2d 831, 853 (2d Cir.1992).

■ In short, *Malcolm* did not alter the law of consolidation of mass toxic torts in this Circuit. Notwithstanding, the previously ordered consolidation should be reevaluated in light of *Malcolm* to ensure that this court's application of the eight Maryland factors is considered, particularly with regard to a "state-of-the-art" defense such as that raised by Keene in the consolidated trial before Judge Sifton.

### 1. *Worksite*

The first of the eight Maryland factors is whether the plaintiffs worked at a common worksite. Here, three of the worksites are the Brooklyn Navy Yard.[5] The others are other construction sites. This results in diversity, principally with respect to product identification, and to some degree occupation as noted below. To some degree, the divergence in worksite between the six plaintiffs weighs against consolidation.

However, the diversity of worksites among these plaintiffs was recognized in the Prior Opinion. In the case at bar, then as now, the worksites in the present case pose nowhere near the potential for confusion that the hundreds of worksites in *Malcolm* did. As noted above, Luchnick, Pulizzi, and Smolowitz were exposed to asbestos when they worked at the same worksite, the Brooklyn Navy Yard. Strafford alleges exposure through asbestos-containing gaskets while working as a valve repairman in a sheet-metal workshop, and Tabolt alleges expose during work at a farmer's co-op. Only two allege multiple sites: Smolowitz alleges exposure at numerous construction sites, and Consorti, in the course of his work as a professional asbestos insulator and insulation repairman, alleges exposure at various sites throughout the city.

This diversity is less likely to confuse the jury than the multiplicity of worksites in *Malcolm* for two reasons: first, there are only three worksites for four of the defendants, and second, the numerous worksites are an irrelevant issue for one of the two remaining plaintiffs. The Brooklyn Navy Yard (Luchnick, Pulizzi, Smolowitz), the machine shop (Strafford) and the farmers' co-op (Tabolt) are the only worksites alleged for four of the defendants.

Although Consorti has alleged numerous worksites, these are not significant in the context of his case. The issue behind consolidating shared worksites is to simplify the proof of product identification and to make it less potentially confusing, something which is not at issue in *Consorti*. Market share liability is not determinative. Instead, the plaintiff bears the burden of proof to establish that he was actually exposed to the product or products of each defendant, *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 504, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989), and that this exposure to the defendant's product was at least a substantial contributing factor to the injury, *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983). The usual method of identifying the defendants' products as the proximate harm to the plaintiffs typically depends upon testimony, usually the eyewitness testimony of fellow-workers, identifying the defendants' product on the jobsite at the time the plaintiff was employed. Shared worksites among different plaintiffs makes product identification correspondingly easier, since testimony that a certain asbestos-containing product was at the worksite at a certain time need be heard only once when more than one plaintiff may have worked at the site at that time.

Consorti was 40% owner of his own business, and the identification of the products which he used will be offered through the business records of Veteran, not from eyewitness identification of the products at the job site. Although testimony will still be required to establish how much of a defendants' product was used at that site, the issue of product identification will be correspondingly less.

In only one case, Smolowitz, does the multiplicity of job sites truly make product identification from job sites an issue in favor of severance. However, since Smolowitz is the only plaintiff with a multiplicity of jobsites requiring eyewitness testimony, there can be

---

5. The Court is aware, of course, that conditions in the Brooklyn Navy Yard will vary widely between the 1940's and the early 1970's, when Smolowitz alleges he worked there.

relatively little danger of confusion between plaintiffs based on the lack of a common jobsite. The analysis of common worksite in *Malcolm*, therefore, is not determinative of this motion for reconsideration of consolidation, because the divergence of worksites here does not pose the problems of confusion among plaintiffs and among product identifications which were at issue in *Malcolm*.

### 2. *Similar Occupation*

Similar occupation is a significant factor because a worker's exposure to asbestos must depend mainly upon his occupation. This is relevant to a defendant's "state-of-the-art" defense; for example, the difference between "direct exposure" and "bystander exposure" noted in *Malcolm* is alleged to be required where a defendant argues its company had some evidence that employees working directly with the material might be at risk but, at the time, there was no evidence whether workers engaged in other tasks would be at risk.

In the case at bar, the occupations of the workers are dissimilar, and this works against consolidation. But, again, this was noted in the Prior Opinion; and, as indicated there, consolidation may eliminate duplicative general evidence concerning exposure to certain kinds of asbestos products. Only Consorti (through his work as an insulator) and Smolowitz as part of his claim (through his work as a taper) allege direct asbestos exposure. The rest allege what the Second Circuit described as "bystander" exposure: Pulizzi as a shipfitter, Luchnick as a welder, Strafford as a sheetmetal worker, Tabolt as a stock clerk, and Smolowitz through exposure from asbestos-containing pipe insulation and cement at the construction sites where he worked. Luchnick, Strafford, Tabolt and Smolowitz all allege exposure from gaskets or packing materials, and shared testimony as to the airborne fibers from these products should not change significantly from one case to another. Under these circumstances, testimony as to the state of the art for bystander capacity should not serve to confuse the jury.

While the failure to provide an adequate warning renders a product defective, *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1987–88 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), the duty to warn is not absolute, for a manufacturer must only warn of dangers about which it knew or should have known. In asbestos cases, the duty to warn varies according to the time, since it depends upon the extent of scientific and medical knowledge which the defendant possessed at the time about different levels of exposure, foreseeable use, types of diseases caused by asbestos, and the extent to which asbestos dust could travel. Where exposure extended through the 1960s and 1970s—at which point warnings and safety measures became required or customary—the jury's determination of defect may involve the adequacy of a warning and an evaluation of a recipient's propensity to ignore or benefit from warning, as the Fifth Circuit observed in *Jackson v. Johns–Manville Sales Corp.,* 727 F.2d 506, 516 (5th Cir.1984), *aff'd in relevant part Jackson v. Johns–Manville Corp.,* 750 F.2d 1314, 1317 (5th Cir.1985). As the Fifth Circuit had observed in an earlier case:

> [A] determination that a particular product is so unreasonably hazardous as to require a warning of its dangers is not an absolute. Such a determination is necessarily relative to the scientific knowledge generally known or available to the manufacturer at the time the product in question was sold or otherwise placed in the stream of commerce.

*Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334, 344 (5th Cir.1982).

Precautions will be taken to ensure that the jury understands the distinctions between the defendants' theories of defense as discussed below.

### 3. *Times of Exposure*

In *Malcolm*, the Court of Appeals for the Second Circuit found that the time frame which the jury was required to consider, from the 1940's through the 1970's, was "enormous," and that "[w]hile some plaintiffs suffered asbestos exposure over periods of up to 30 years, others had much shorter periods of exposure, undercutting the benefit

of efficiency and increasing the likelihood of prejudice." *Malcolm* at 351.

Here, as in *Malcolm*, the plaintiffs have alleged exposures from the 1940's through the 1980's. Again, there are significant differences between the facts of these cases and the facts of the 48 plaintiffs grouped together in *Malcolm*. Four of the plaintiffs have alleged very brief and specific dates of exposure—Luchnick, 1940–45; Pulizzi, 1942–45; Tabolt, 1965–70, and Strafford, solely in 1962. Only Smolowitz and Consorti have both alleged exposures extending over a period of decades. Testimony as the state of knowledge of particular years, however, will help the jury in deciding liability even in these cases.

#### 4. *Disease Type*

In *Malcolm*, among the 48 plaintiffs, 28 suffered from asbestosis, 10 suffered from lung cancer, 10 from mesothelioma. The Court of Appeals found that "[t]he significance of this disparity is obvious.... The opportunity for prejudice is particularly troubling where, as here, asbestosis sufferers, who may under certain circumstances expect close to a normal life span, are paired for trial with those suffering from terminal cancers, such as mesothelioma and lung cancer." *Malcolm*, at 351.

In this case, only one of the plaintiffs, Smolowitz, is suffering from asbestosis. The rest have all alleged precisely the same illness: mesothelioma, a type of cancer so closely linked to asbestos exposure that it is considered a "signature" disease of exposure to asbestos.[6] At least four of the plaintiffs— Consorti, Pulizzi, Strafford, and Tabolt— smoked regularly, and their parallel smoking histories will permit the jury to compare testimony about the health results of such behavior.

#### 5. *The Living and the Dead*

In this Court's earlier opinion in *In re Joint Eastern & Southern Dist. Asbestos Litig. (Drago)*, 125 F.R.D. 60, 63 (E.D.N.Y. 1989) (Sweet, D.J.), the Court expressed the concern that the "dead plaintiffs may present the jury with a powerful demonstration of the fate that awaits those claimants who are still living," when it is entirely possible that the asbestosis-related disease of the living plaintiffs in fact would not prove fatal, *see Drago*, 125 F.R.D. at 66. This Court approved the consolidation in the instant case, however, in light of the Second Circuit's approval of a similar consolidation in *Johnson*:

> Instructions were given throughout the trial and in the charge to caution the jury to consider each plaintiff's claims individually. Two separate verdict forms were provided to the jury, one for *Johnson*, the other for *Higgins*.... In the instant case, the trial court was well within its discretion to consolidate the two cases and the court acted throughout in a manner which ensured that each plaintiff's claim was considered separately.

*Johnson*, 899 F.2d at 1285. According to the Court of Appeals in *Malcolm*, *Johnson* is still good law, *see Malcolm* at 350 and 351 (relying upon *Johnson's* use of the Maryland factors and general analysis of tort law). Here, at this writing, four of the plaintiffs alleged to have suffered mesothelioma are dead, and only Consorti, alleged to be similarly stricken, and Smolowitz, alleged to have asbestosis, are alive. The emphasis which the Court will place upon the separate consideration of the living and the dead should overcome any unfair prejudice.

#### 6. *Discovery Status*

The Court of Appeals noted the absence of any express finding of readiness in the district court's decision rejecting a challenge to consolidation, and in general expresses skepticism about whether the third and fourth-party defendants, some of whom were impleaded only days before trial, could have been ready.

In this case, however, these cases were remanded to this Court precisely because all relevant pretrial proceedings had been completed according to Judge Weiner's Amended Order dated December 16, 1992. Flintkote, in its Memorandum of Law, somewhat disingenuously states that the consolidation should be reconsidered because "[a]t the time consolidation was ordered in February, the

---

**6.** *See* Daniel A. Farber, *Toxic Causation,* 71    Minn.L.Rev. 1219, 1251–53 (1987).

cases were simply not all trial-ready," although it states nothing about the current state of the cases. The other defendants admit the cases are ready for trial.

Only minor discovery matters remained after a pretrial conference with all parties on June 4, 1993. "Most of the discovery has already been completed and it appears that the remaining discovery will be completed prior to trial; thus, this criterion would appear to be satisfied" (Mem. of Def. Keene in Opp. to Consolidation); "[w]hile it is true that plaintiffs are represented by the same counsel and that discovery by all cases is in more or less the same stage, still the fact that these cases so greatly differ with respect to [other factors] makes them inappropriate for consolidation" (OCF Mem. in Support of Severance). The readiness for trial and potential prejudice to the one third-party defendant which has filed motion papers, Veteran, is discussed below.

### 7. *Counsel*

As with discovery, this factor lends itself to consolidation. All plaintiffs are represented by the same counsel, and in fact the cases of these plaintiffs were selected and remanded for trial upon the recommendation of their common counsel.

### 8. *Cancer*

All the plaintiffs save Smolowitz have pleaded the same form of cancer, mesothelioma. Crane has alleged that Strafford's expert states that Strafford's cancer may be lung cancer.

### *Measures to Reduce Prejudice and Confusion*

In *Malcolm* at 352 the Court of Appeals noted the measures taken in *Johnson,* 899 F.2d at 1285, to keep the identity of parties and issues separate, notably instructions throughout the trial and separate verdict forms. In *Brooklyn Navy Yard I,* Judge Weinstein described the particular measures used in the trial of the consolidated Brooklyn Navy Yard cases, techniques which made the Court of Appeals consider it "a chiaroscuro study" in contrast with the trial in *Malcolm.* The Court of Appeals in *Brooklyn Navy Yard II* did not specify the measures taken

by Weinstein, but these included juror notebooks, photographs of witnesses and plaintiffs, interim instructions, interim summations, and detailed special verdict instructions. Similar interim instructions, summations and techniques will be considered and adopted where appropriate during the consolidated trial. Such techniques not only made that trial fair but also more efficient; as the Court of Appeals noted in *Malcolm,* the trial of 64 cases during Phase I in *Brooklyn Navy Yard I* took four months, whereas the trial of the consolidated Powerhouse cases took ten months. The time currently estimated for these six cases is five weeks.

### *Consolidation of the Six Cases is Still Warranted*

In short, after reconsidering the eight Maryland Factors in the light of *Malcolm,* consolidation remains appropriate largely for the reasons stated in the Prior Opinion. That Opinion surveyed some of the recent academic literature on the issues raised by asbestos litigation, issues of cost and efficiency which are still relevant to these proceedings.

In the best of all possible worlds, in every asbestos action each plaintiff would have a full, individual trial—and each defendant would be able to pay the judgement in full. Neither is the case. An example of the effect these massive filings have had on the defendants is seen in the statistics cited by the Keene Corporation in its motion to stay this litigation against it:

> Keene has already spent more than $430 million to resolve more than 95,000 claims, and still has 98,000 claims pending. It no longer has any insurance coverage. Moreover the vast majority of its remaining assets are tied up in bonding requirements for judgments presently on appeal. Currently, 2,000 new suits are being filed monthly. Between January 1, 1993 and May 1, 1993, about two dozen verdicts totalling over $20 million have been reached against Keene. Just in the first three months of 1993, the actual amount available in the fund declined by more than $16 million. At this rate, Keene will run out of funds long before all of the present claimants have been even partially compensated, and there is no hope that those

who filed late claims or who file claims in the future will receive any compensation. Mem. in Support of Keene Corp.'s Motion to Stay, at 2. It is unbecoming to recant faith in the best of all possible worlds,[7] but in this instance it is necessary.

### Keene's Motion for a Stay of Proceedings

■ On May 13, 1993, Keene moved before Judge Weinstein pursuant to Rule 23(b)(1)(B), F.R.Civ.P., for certification of a limited fund class comprised of all persons or entities who have asserted present or future claims against Keene, on the grounds that Keene's assets are inadequate to continue with case-by-case adjudication of all the asbestos claims filed against it, *In re Joint Eastern & Southern Asbestos Lit. (Keene v. Fiorelli)*, 93 Civ. 2129. Keene alleges that it has assets of roughly $100 million which are insufficient to defend the close to 100,000 asbestos-related cases pending against it, that a properly controlled Rule 23(b)(1)(B) proceeding would be more equitable for its claimants than its bankruptcy, and that certification of a settlement class could preserve Keene as a viable entity. In conjunction with the class certification, Keene has also requested an injunction against all litigation pending against it in state and federal courts. An order certifying a class has not been entered, but hearings by a Special Master on the issues are scheduled for this month.

Until the issues raised in Keene's case before Judge Weinstein are resolved, or until a stay is issued or requested by Judge Weinstein, it is inappropriate for this Court to intrude. Keene's motion for a stay is therefore denied this time with leave granted to renew in the event of a change in circumstance.

### Veteran's Motion for Severance

■ OCF had impleaded two third-party defendants, one of which, Veteran, has filed a motion for a separate trial pursuant to Rules 14(a) and 42(b), F.R.Civ.P. Veteran was John Consorti's immediate employer, an insulation repair company 40% owned by Con-

sorti. The essence of Veteran's claim is that it will be prejudiced at trial because, should the trial start as scheduled on June 21, 1993, it will have had only a month and a half to prepare its case. Veteran was impleaded by OCF on May 4, 1993. While it has received certain discovery evidence, and has participated in certain depositions, it maintains that discovery is not yet complete and that it has not had an opportunity to review its own documents, produced in discovery to the plaintiffs prior to being brought into the action. It resolutely insists that a mere month and half is an insufficient time for trial.

On the other hand, Veteran has all discovery save copies of its own documents; and as OCF has observed, these documents should not be completely unfamiliar. Veteran, of course, has access to officer and part owner Consorti, who is presumably entirely familiar with he factual issues.

■ Under Rule 14(a), F.R.Civ.P., a defendant may implead a "person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him." Rule 14(a) is designed to prevent the courts from trying several related cases in different lawsuits and to enable all related claims to be disposed of in once action. *See Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 14, 20 (S.D.N.Y.1985); *State Mutual Life Assur. Co. v. Arthur Andersen & Co.*, 65 F.R.D. 518, 521 (S.D.N.Y.1975).

Here, the factual and legal issues are common to both the third-party complaint and the underlying action, and testimony and evidence relevant to both trials is expected to be presented. This is classic instance in which a manufacturer of a defective product has impleaded the employee's immediate employer, and the questions of law and fact presented will be the same. A separate trial for Veteran would merely be duplicative of the main action.

■ However, a separate trial would be warranted if Veteran could show that it

---

**7.** Voltaire, *Candide*, in *The Portable Voltaire* 322 (ch. 18) (Ben Ray Redman, ed., Penguin books 1977) (1759).

would be sufficiently prejudiced by being forced to appear in this case and such prejudice outweighs the gains in economy and efficiency. *Garber v. Randell*, 477 F.2d 711 (2d Cir.1973). Veteran bases its allegation of prejudice on its lack of opportunity to review its own documents. They acknowledge the receipt of other discovery materials, including transcripts of depositions of the plaintiff and the plaintiff's responses to interrogatories. As noted above, they have been given the chance to attend depositions of key witnesses, such as Peter Consorti, the brother of the plaintiff and President of Veteran.

The only documents Veteran has specified as being unavailable to it are its own, and copies of these have been made available by order of the court. The prejudice alleged in Veteran's failure to review its own documents is minimal and is outweighed by the convenience, economy and expedition of a single trial with all potential defendants. OCF did delay in bringing its third-party action, but not such that it would be inequitable to include Veteran now.

The case cited by Veteran, *Ismail v. Cohen*, 706 F.Supp. 243, 251 (S.D.N.Y.1989), merely states that a court may order separate trials in order to expedite the proceedings and preserve judicial resources. Veteran has cited no evidence which would be admissible only on a certain issue, and therefore may prejudice that party on other issues in the minds of the jury, as was alleged as the basis for severance in *Ismail*. Veteran has merely alleged that it has not had the chance to be present at some depositions—such as depositions of the plaintiff or of the plaintiff's sister—and that it has just now served interrogatories and document requests upon OCF in an attempt to ascertain the basis of OCF's claims. Alleging prejudice based on a flurry of last minute discovery requests is not enough. The motion for severance by Veteran is denied.

### Conclusion

For the reasons set forth above, the consolidation of these six actions has been reconsidered and, upon reconsideration, upheld. Keene's motion for a stay pending class certification pursuant to Rule 23(b)(1)(B), F.R.Civ.P., is hereby denied. Veteran's mo-

tion for severance or for a separate trial is hereby denied.

It is so ordered.